# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| HONARY ENTERPRISES, LLC., <br><br> Plaintiff, <br><br> vs. <br><br> HARRY DAVIS, LLC, et al., <br><br> Defendants. | No. C24-107-LTS-KEM <br><br> **MEMORANDUM OPINION AND ORDER** |

## I. INTRODUCTION

This case is before me on a motion (Doc. 30) for default judgment against defendant 1749348 Ontario Inc., d/b/a Tillsonburg Custom Foods (Tillsonburg), by plaintiff Honary Enterprises, LLC (Honary). No party has filed a resistance and the time for doing so has expired.

## II. PROCEDURAL HISTORY

On October 4, 2024, Honary filed a complaint (Doc. 1) against defendants Harry Davis LLC (HD), Leonard Davis (Davis) and Tillsonburg alleging breach of written and oral contracts against HD, fraudulent inducement against Davis and breach of contract and unjust enrichment against Tillsonburg. The complaint was served on Tillsonburg via process server on November 5, 2024. Doc. 13. On December 17, 2024, Honary moved for the entry of default against Tillsonburg and the Clerk of Court entered default the next day. Doc. 16. On February 6, 2025, Honary moved to amend the complaint to reflect the corporate name of Tillsonburg, 1749348 Ontario Inc. Chief United States Magistrate Judge Kelly K.E. Mahoney granted the motion and also extended the deadline

for Honary to file a motion for default judgment.[1]  *See* Doc. 28.  Honary filed its amended complaint (Doc. 29) on February 19, 2025.  On February 24, 2025, Honary filed its motion (Doc. 30) for default judgment against Tillsonburg.

### III.     APPLICABLE STANDARDS

Federal Rule of Civil Procedure 55 provides, in relevant part:

(a)     ENTERING A DEFAULT.     When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

(b)     ENTERING A DEFAULT JUDGMENT.

(1)     *By the Clerk*.  If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk—on the plaintiff's request, with an affidavit showing the amount due—must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing and who is neither a minor nor an incompetent person.

(2)     *By the Court*.  In all other cases, the party must apply to the court for a default judgment. . . . If the party against whom a default judgment is sought has appeared personally or by a representative, that party or its representative must be served with written notice of the application at least 7 days before the hearing. The court may conduct hearings or make referrals—preserving any federal statutory right to a jury trial—when, to enter or effectuate judgment, it needs to:

      (A)     conduct an accounting;
      (B)     determine the amount of damages;
      (C)     establish the truth of any allegation by evidence; or
      (D)     investigate any other matter.

Fed. R. Civ. P. 55(a)-(b).  Thus, as this court has explained:

---

[1] As explained in the order, the amendment to reflect Tillsonburg's corporate name did not invalidate service so long as the correct party received notice.  Honary indicated that the address to which it affected service is the same address listed for the formal corporate name.  Doc. 28.

> "Entry of a default under Federal Rule of Civil Procedure 55(a) is not, as such, entry of a judgment; it merely permits the plaintiff to move for a default judgment under Rule 55(b)(2), assuming that the default is not set aside under Rule 55(c)." Moreover, "'a default judgment cannot be entered until the amount of damages has been ascertained.'" . . . Thus, if the judgment sought is not for a sum certain, Rule 55(b)(2) provides that "the court may conduct such hearings or order such references as it deems necessary and proper" in order to "enable the court to enter judgment . . . ." In short, as this court has explained, Rule 55 "requires two steps before entry of a default judgment: first, pursuant to Fed. R. Civ. P. 55(a), the party seeking a default judgment must have the clerk enter the default by submitting the required proof that the opposing party has failed to plead or otherwise defend; second, pursuant to Fed. R. Civ. P. 55(b), the moving party may seek entry of judgment on the default under either subdivision (b)(1) or (b)(2) of the rule."

*Hayek v. Big Brothers/Big Sisters of America*, 198 F.R.D. 518, 520 (N.D. Iowa 2001) (citations omitted).

Upon entry of default, "the factual allegations of a complaint (except those relating to the amount of damages) are taken as true, but 'it remains for the court to consider whether the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law.'" *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010) (quoting 10A C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2688 at 63 (3d ed. 1998)). "[A] default judgment cannot be entered until the amount of damages has been ascertained." *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1042 (8th Cir. 2000) (quoting *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 97 (2d Cir. 1993)). "The court may conduct hearings or make referrals . . . when, to enter or effectuate judgment, it needs to: (A) conduct an accounting; (B) determine the amount of damages; (C) establish the truth of any allegation by evidence or (D) investigate any other matter." Fed. R. Civ. P. 55(b)(2). A plaintiff must prove its damages by a preponderance of the evidence and all reasonable inferences must be afforded to the plaintiff from the evidence. *See Everyday Learning Corp. v. Larson*, 242 F.3d 815, 818 (8th Cir. 2001); *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d

3

Cir. 1981). "Once the amount of damages has been established, the court may enter judgment pursuant to the rule." *Stephenson v. El-Batrawi*, 524 F.3d 907, 916 (8th Cir. 2008).

## IV. ANALYSIS

### A. *Relevant Facts*

The amended complaint (Doc. 29) alleges that around November 2023, Honary acquired a food processing plant in Grundy Center, Iowa, that was previously owned by Richelieu Foods. Doc. 29 at 3. Honary intended to sell the food processing equipment to generate income and cash flow and retain only the real estate to launch its business venture. *Id.* On December 16, 2023, Davis contacted Honary's owner, Lou Honary, and offered to provide auctioneering services. *Id.* at 4. A couple of days later, Lou Honary and Davis spoke again and agreed that HD would provide auctioneering services for a 15 percent buyer's commission and an additional three percent for fees related to services from any third-party internet provider. Additionally, if the total sales proceeds exceeded $850,000, Honary would pay a seller's commission at 15 percent of the amount in excess of $850,000. *Id.* at 5.

Honary signed a written agreement to this effect on December 19, 2023. *Id.* The agreement also provided that the equipment could be sold via negotiated sale before the auction with the Seller's approval. Specifically, the compensation paragraph in the agreement stated:

> HD shall collect and retain an industry standard buyer's premium of fifteen percent (15%) (the "Buyer's Premium"), *which will be added to the purchase price and paid by the buyers for each item of Equipment*, whether sold at the Auction or by Negotiated Sales. Buyers at the Auction will be required to pay an additional industry standard Internet buyer's premium of Three Percent (3%) (the "Internet Buyer's Premium") which will be collected by HD and remitted to the Internet Provider. Seller shall have no interest in the Buyer's Premium or the Internet Buyer's Premium.

4

> *Provided however, in the event the Auction bid amounts equal or exceed Eight Hundred Fifteen [sic] Thousand Dollars ($850,000) Seller agrees to pay HD a commission of Fifteen Percent (the "Success Commission.").*

*Id.* at 6 (emphasis provided in amended complaint). If the equipment was sold via auction, the agreement provided that the buyer would have 40 days to remove the equipment and HD had the obligation to identify a qualified rigging company to accomplish the removal. If the equipment was sold via negotiated sale, there was no specific timeline for removal provided in the agreement. *Id. See also* Doc. 29-1 at 2-3.

HD scheduled the auction for March 7, 2024, and sent two representatives to inspect the equipment and generate a complete catalogue in preparation for the auction. It also introduced potential buyers to the equipment for potential negotiated sales. *Id.* Tillsonburg was one of the interested buyers who traveled to Iowa to inspect the equipment. *Id.*

In early March 2024, Davis called Honary to report that Tillsonburg had offered $900,000 to purchase the entire Catalogue, minus a few equipment items that were unrelated to food processing, prior to the Auction. Davis explained the following terms and benefits of Tillsonburg's offer to Honary as follows:

    a.    Tillsonburg would purchase the entire Catalogue, minus a few pieces of equipment unrelated to food processing (referred to as the Tillsonburg Catalogue and attached to the amended complaint as Exhibit B) and the auction would be cancelled

    b.    The same removal timeline (40 days) would apply to Tillsonburg with regard to removal of the Tillsonburg Catalogue

    c.    Honary and HD would avoid having to interact with multiple bidders from across the country in the aftermath of the Auction for equipment removal, needing only to coordinate with Tillsonburg to remove the bulk of the equipment on site; and

    d.    HD would charge Tillsonburg a 15% buyer's commission against the purchase price of $900,000 and would charge Honary a 15% seller's commission against the $50,000, which was the portion of the sales price that exceeded $850,000.

5

*Id.* at 7.  Honary accepted the proposed transaction as a Negotiated Sale based on the above representations, referred to as the First Supplemental Agreement.  *Id.* at 7-8.

Tillsonburg rendered $900,000 to HD.  While awaiting payment, Honary received a call from Davis on or around March 5, 2024.  Davis represented that due to the geographical distance between Grundy Center, Iowa, and Ontario, Canada, and the resulting transportation costs, Tillsonburg wanted to proceed with the auction on March 7, 2024, to sell certain items it did not want to transport to Canada.  *Id.* at 8.  The parties reached an agreement that Tillsonburg would ensure removal of the Tillsonburg Catalogue, regardless of what was sold via auction and transported to Canada, within 60 days from the date of the auction (May 6, 2024).  This was referred to as the Second Supplemental Agreement.  *Id.*

The auction proceeded as scheduled on March 7, 2024.  HD did not indicate to the bidding public that ownership had changed from Honary to Tillsonburg.  It also put up the entire Catalogue without removing the items desired by Tillsonburg.  Several items were sold to buyers across the country, including those previously desired by Tillsonburg.  Honary believes the total auction proceeds exceeded $1,800,000.00.  *Id.* at 8-9.  Tillsonburg then removed various equipment to Canada and some Internet auction buyers also removed their respective purchases from Honary's property.  However, a significant number of items from the Tillsonburg Catalogue were not sold via auction and were not removed by Tillsonburg.  *Id.* at 9.

On April 1, 2024, HD told Honary that it would conduct a second auction on April 19, 2024, in an attempt to sell the remaining equipment "as a means to minimize the clean-up, waste and unsold."  *Id.*  Some of the items were sold during this clean-up auction and Honary facilitated the removal of items with these buyers.  However, by May 6, 2024, there was still various equipment from the Tillsonburg Catalogue that remained on the premises, and remained there as of the date of Honary's amended complaint, which Honary alleges takes up significant space and prevents it from fully using the property.  *Id.*  Honary followed up with HD repeatedly regarding the prompt removal of the leftover

equipment to no avail. *Id.* Prior to filing this lawsuit, Honary alleges it reached out to Tillsonburg to attempt to coordinate the removal of the leftover equipment to no avail. *Id.* Honary estimates the removal will cost $75,000 as fees to the rigging company. HD also claims that Honary owes 15 percent of the entire $900,000 purchase price, as opposed to 15 percent of the $50,000 that was in excess of $850,000 as a seller's commission and has withheld $135,000 from Honary. *Id.* at 10.

Honary alleges claims of breach of written and oral contracts against HD, fraudulent inducement against Davis and breach of contract and unjust enrichment against Tillsonburg. *Id.* at 12-13. It seeks damages "in an amount that adequately compensate the full extent of economic losses suffered by the Plaintiff." *Id.* at 13-14.

### B. Discussion

Honary has successfully completed the first step of the default judgment process by making the showing necessary for the entry of Tillsonburg's default pursuant to Rule 55(a). Docs. 15, 16. Prior to reviewing Honary's motion, I must first determine whether the court has jurisdiction over the subject matter and personal jurisdiction over Tillsonburg and that Tillsonburg was properly served. *See In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999) ("When the entry of judgment is sought against a party who has failed to plead or otherwise defend, a district court has an affirmative duty to look into its jurisdiction over both the subject matter and the parties.").

Honary asserts that the court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on the diversity of the parties and the amount in controversy exceeding $75,000. Doc. 29 at 1-2. With regard to the diversity of the parties, Honary asserts that Tillsonburg is a corporation organized under the laws of Ontario, Canada, with its principal place of business in Tillsonburg, Ontario, Canada, and that Honary is a limited liability company organized under the laws of Iowa with its principal place of business

7

located in Grundy Center, Iowa.[2]  With regard to the amount in controversy, Honary alleges in the amended complaint that the removal of the remaining Tillsonburg Catalogue would cost $75,000.  Doc. 29 at 10.  In support of its motion for default judgment, Honary has provided an affidavit (Doc. 30-1) from Lou Honary, the owner and manager of Honary.  The affidavit asserts that the cost of removal and disposal of the remaining equipment is $132,982.50 according to an updated quote from the rigging company.  Doc. 30-1 at 2.  The original quote of $75,000 was in light of the fact that the rigging company was already onsite.  It also did not include any disposal fees.  The updated quote now includes costs related to travel for the crew and equipment as well as disposal of the leftover equipment at the site.  *Id*.  Honary asserts that it has also lost rental/storage income in the amount of $36,787.50 due to the space occupied by the leftover equipment.  Honary seeks damages in the amount of $169,770.00.  *Id*. at 3.  Based on the representations in the amended complaint and Honary's affidavit, I find the court has subject matter jurisdiction under 28 U.S.C. § 1332.

With regard to personal jurisdiction, Honary alleges the court has specific personal jurisdiction because the defendants have purposefully availed themselves of the privileges of conducting business in Iowa.  Doc. 29 at 2.  The actions constituting purposeful availment by Tillsonburg include visiting and inspecting food processing equipment located in Grundy Center, Iowa, making purchases from Honary and removing and transporting equipment from Iowa.  This is sufficient to establish specific jurisdiction.  *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (stating specific jurisdiction exists where the defendant has "purposely directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to

---

[2] Of course, the citizenship of a limited liability company depends on the citizenship of its individual members.  *See GMAC Commercial Credit LLC v. Dillard Dept. Stores, Inc.*, 357 F.3d 827, 829 (8th Cir. 2004) ("an LLC's citizenship is that of its members for diversity jurisdiction purposes").  Based on Honary's amended citizenship disclosure statement (Doc. 9), its sole member is not a citizen of Canada and Honary is therefore diverse from Tillsonburg.

those activities."). Honary has established that this court has jurisdiction over the subject matter and over Tillsonburg as a defendant.

Service of process upon foreign corporations is governed by Federal Rule of Civil Procedure 4(h). The applicable part of this rule provides that when serving a foreign corporation at a place not within any judicial district of the United States, any manner prescribed by Rule 4(f) for serving an individual may be used, except personal delivery under (f)(2)(C)(i). Fed. R. Civ. P. 4(h)(2). Rule 4(f) provides that that service may be accomplished: "(1) by any internationally agreed means . . . that is reasonably calculated to give notice, such as those authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents." Both the United States and Canada are signatories to the Hague Convention. *Signify N. Am. Corp. v. Axis Lighting Inc.*, No. 19cv5516, 2019 WL 4994288, at *1 (S.D.N.Y. Oct. 8, 2019) ("Canada and the United States are both signatories to the Hague Convention.") The Hague Convention requires "each state to establish a central authority to receive requests for service of documents from other countries. Once a central authority receives a request in the proper form, it must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698-99 (1988).

Alternatively, service may be accomplished through alternative methods unless the receiving country objects. *See Facebook, Inc. v. 9 Xiu Network (Shenzhen) Tech. Co., Ltd.*, 480 F. Supp. 3d 977, 980 (N.D. Cal. 2020) (citing Articles 8-10 of the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents). For instance, if the State of destination does not object, "judicial officers, officials or other competent persons of the State of origin" may "effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of

destination."³ Art. 10(b). Canada does not object to any method described under 10(b). *See* https://www.hcch.net/en/states/authorities/details3/?aid=248. Countries may also designate additional methods of service within their borders, either unilaterally or through side agreements with each other. *Id.* (citing Articles 11, 19).

The executed summons (Doc. 13) in this case indicates that Honary used the services of APS, International, Ltd., a process server, to complete service. Service was completed by delivering: the summary of documents to be served, summons in a civil action, complaint, Exhibits A and B and materials provided by the Clerk of Court to Meghan Sullivan, Account Manager, of Tillsonburg Custom Foods on November 5, 2024, "pursuant to the Ontario Rules of Service." Doc. 13. The Rules of Civil Procedure used in Ontario provide that personal service on a corporation requires "leaving a copy of the document with an officer, director or agent of the corporation, or with a person at any place of business of the corporation who appears to be in control or management of the place of business." *See* Rule 16.02(c) (https://www.ontario.ca/laws/regulation/900194#BK138). An account manager would appear to fit within this definition. Because Honary's method of service complies with the Hague Convention, particularly Article 10(b), I find that Tillsonburg was properly served.⁴

Turning to Honary's motion for default judgment, I must determine whether the factual allegations set forth in the complaint, when accepted as true, establish Tillsonburg's liability. I must accept as true all factual allegations of the complaint,

---

[3] As Canada's declarations note, process servers fall within "judicial officers, officials or other competent persons" in Arts. 10(b), (c) and may be used to accomplish service in every province but Quebec. *See* https://www.hcch.net/en/states/authorities/details3/?aid=248.

[4] This is based on the information before me. In the event Tillsonburg would seek to set aside a default judgment based on lack of proper service, it would bear the burden of proving it "lacked actual notice of the proceedings" or that "technical deficiencies prejudiced it in any way." *Northrup King Co. v. Compania Productora Semillas Algodoneras Selectas, S.A.*, 51 F.3d 1383, 1389 (8th Cir. 1995).

except those relating to the amount of damages. *Everyday Learning Corp.*, 242 F.3d at 818. I must also ensure that "the unchallenged facts constitute a legitimate cause of action" prior to entering final judgment. *Murray*, 595 F.3d at 871.

Honary has alleged claims of breach of contract and unjust enrichment against Tillsonburg. On its breach of contract claim, Honary alleges that HD, acting as the agent for Honary, entered into a contract with Tillsonburg for the sale of the Tillsonburg Catalogue for $900,000.00. Doc. 29 at 13. Honary states that upon information and belief, as part of that contract, Tillsonburg agreed to remove its purchase within 40 days of March 7, 2024, and later expanded the time to 60 days, or May 6, 2024. *Id.* Honary alleges it has performed all its obligations under the contract and that Tillsonburg has failed to remove the Tillsonburg Catalogue on or before May 6, 2024, as required by the contract. As a result, Honary alleges it has suffered economic losses.

As for its unjust enrichment claim, Honary alleges that by storing the remaining or leftover equipment from May 7, 2024, to the present date, Honary has conferred a benefit on Tillsonburg because the equipment is no longer owned by Honary. Honary alleges it has suffered and continued to suffer economic damages in the form of storage costs, inability to use its premises and loss of business income, including rent, as a result.

To prevail on a breach of contract claim under Iowa law, a plaintiff must prove:

> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that [plaintiff] has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998) (citing *Iowa-Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993)). A party breaches a contract when, without legal excuse, the party fails to perform any promise that forms a whole or a part of the contract. *Id.* (citing *Magnusson Agency v. Public Entity Nat'l Co. Midwest*, 560 N.W.2d 20, 27 (Iowa 1997)). Unjust enrichment under Iowa law is "a broad principle with few limitations." *Endress v. Iowa Dep't of*

*Human Servs.*, 944 N.W.2d 71, 80 (Iowa 2020). A plaintiff must prove (1) defendant was enriched by the receipt of a benefit; (2) the enrichment was at the expense of the plaintiff; and (3) it is unjust to allow the defendant to retain the benefit under the circumstances." *State, Dept. of Human Servs. ex rel. Palmer v. Unisys Corp.*, 637 N.W.2d 142, 154-55 (Iowa 2001).

Accepting the amended complaint's factual allegations as true, Honary has established a breach of contract and unjust enrichment by Tillsonburg. Even if liability is established through a default judgment, the plaintiff must prove actual damages to "a reasonable degree of certainty." *Everyday Learning Corp.*, 242 F.3d at 819. An evidentiary hearing is unnecessary if the damages are "readily discernable on the basis of undisputed evidence in the record." *Cutcliff v. Reuter*, 791 F.3d 875, 883 (8th Cir. 2015). The court "may rely on detailed affidavits or documentary evidence to determine the appropriate sum for the default judgment." *Int'l Painters & Allied Trades Indus. Pension Fund v. R.W. Amrine Drywall Co.*, 239 F. Supp. 2d 26, 30 (D.D.C. 2002) (citing *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir. 1979)). Under Rule 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings."

In the original complaint served on Tillsonburg, Honary sought judgment "in an amount that adequately compensate [sic] the full extent of economic losses suffered by the Plaintiff; and . . . any other relief as may be warranted by the applicable laws." Doc. 1 at 13-14. Honary has submitted an affidavit (Doc. 30-1) from Lou Honary to support its damages. The affidavit states it would cost $132,982.50 to have the rigging company remove and dispose of the equipment that Tillsonburg has refused to remove from the Tillsonburg Catalogue. Additionally, the affidavit claims that the leftover Tillsonburg Catalogue equipment occupies approximately 9,000 square feet of a total 75,000-square foot building. Doc. 30-1 at 2-3. Lou Honary attests that the lost rental/storage income

of this space for nine months (May 7, 2024 to February 7, 2024) is $36,787.50.[5] *Id.* at 2. As such, the total damages Honary seeks from Tillsonburg is $169,770.00.

Honary has demonstrated it is entitled to default judgment against Tillsonburg based on its claims of breach of contract and unjust enrichment. It has also supported its claim for damages through Lou Honary's affidavit. Honary is entitled to the damages requested.

## V. CONCLUSION

For the reasons stated herein, Honary's motion (Doc. 30) for default judgment is **granted**. The Clerk of Court is directed to enter judgment against defendant 1749348 Ontario Inc., d/b/a Tillsonburg Custom Foods, and in favor of Honary, in the amount of $169,770.00.

**IT IS SO ORDERED** this 20th day of March, 2025.

_____
Leonard T. Strand
United States District Judge

---

[5] Lou Honary asserts that he has listed a 30,000 square feet section of the plant for rent at the rate of $4.25/square feet per year for a triple net lease and approximately $1.2/square feet for CAM charges (taxes, proper insurance and utilities) for a total of $5.45/square feet. Doc. 30-1 at 2-3.